IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
PLANNED PARENTHOOD        )
SOUTHEAST, INC.; and      )
JANE DOE,                 )
                          )
     Plaintiffs,          )
                          )    CIVIL ACTION NO.
     v.                   )     2:15cv620-MHT
                          )        (WO)
ROBERT BENTLEY, Governor  )
of Alabama, in his        )
official capacity; and    )
STEPHANIE McGEE AZAR,     )
Acting Commissioner,      )
Alabama Medicaid Agency,  )
in her official capacity, )
                          )
     Defendants.          )
```

OPINION

Before the court is a challenge to a decision by the Governor of Alabama to terminate the State's Medicaid provider agreement with Planned Parenthood Southeast, Inc. ('PPSE'), which funds services unrelated to abortion, including routine gynecological exams, pregnancy counseling, and breast- and cervical-cancer screenings. The plaintiffs are PPSE and Jane Doe, a PPSE patient and Medicaid recipient,

suing individually and on behalf of a putative class of similarly situated Medicaid-recipient patients of PPSE. The defendants are the Governor of Alabama and the Acting Commissioner of the Alabama Medicaid Agency; both are sued in their official capacities.

The plaintiffs filed this lawsuit to challenge the termination of PPSE's provider agreement as unlawful under the 'free-choice-of-provider' provision of the Medicaid Act, which states in relevant part that "any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide [her] such services." 42 U.S.C. § 1396a(a)(23). PPSE also claims that the termination violates its rights under the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. PPSE and Doe bring all of their claims under 42 U.S.C. § 1983. Jurisdiction is proper

2

under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

This matter is currently before the court on PPSE and Doe's motion for entry of a preliminary injunction. The motion will be granted on the basis of Doe's Medicaid Act claim.

## I. LEGAL STANDARD

To demonstrate that a preliminary injunction is warranted, a plaintiff must show that "(1) there is a substantial likelihood that he ultimately will prevail on the merits of the claim; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the public interest will not be harmed if the injunction should issue." Cate v. Oldham, 707 F.2d 1176, 1185 (11th Cir. 1983). The plaintiff bears the burden of persuasion as to each of the four

3

required showings.  <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1306 (11th Cir. 1998).


## II. BACKGROUND

### A. State Medicaid Program

The federal Medicaid program was established by Congress to provide low-income families, disabled individuals, pregnant women, and children with affordable medical care.  The program operates as a partnership between the federal government and the States.  Subject to guidelines established by the federal government regarding eligibility for assistance, the types of services covered, and the costs of those services, States receive federal funds. <u>See</u> 42 U.S.C. § 1396a.  Although States are afforded discretion in administering the program, they are required to submit their plans for federal approval. <u>See</u> 42 C.F.R. § 430.10.  The plan operates as a contract between the participating State and the federal government, and the Department of Health and

4

Human Services may withhold federal funds if the State fails to "comply substantially" with the plan as approved and adopted.  42 C.F.R. § 430.35.

As a state participant, Alabama maintains such a plan with the federal government.  The State also maintains "provider agreements" with health-care providers, which impose on providers state and federal regulatory requirements governing the filing of claims. When a provider renders covered services to a Medicaid recipient, the State pays that provider directly. Family-planning services are covered under the Medicaid Act and under the Alabama plan.[1]

---

1. Except in rare cases, Medicaid monies are not used to provide abortions in Alabama.  The Hyde Amendment, a rider attached to congressional appropriations bills since 1976, prohibits the use of federal funds to pay for abortions.  Although it was initially an all-out ban, the Amendment has evolved to exempt cases in which the life of the mother would be endangered by carrying the fetus to term, as well as cases of rape and incest.  See, e.g., Pub. L. No. 113-76, §§ 506-07, 128 Stat. 5, 409 (2014) ("Consolidated Appropriations Act").

However, States are free to fund abortions for Medicaid recipients from their own coffers.  Alabama (continued…)

PPSE is a regional non-profit corporation affiliated with Planned Parenthood Foundation of America ('PPFA'); it operates health centers in Mobile and Birmingham. Through these centers, it provides family-planning and preventive-health services, including physical exams, contraceptive counseling, contraception, breast- and cervical-cancer screenings, treatment for sexually transmitted infections, and pregnancy counseling. Both offices also provide abortions. As an affiliate of PPFA, PPSE is distinct from the national organization; PPSE maintains an independent board and exercises exclusive control over its daily affairs. Although PPSE is not supervised by PPFA, it must comply with certain standards adopted by PPFA in order to operate under the "Planned Parenthood" name.

---

does not do so. <u>See</u> Ala. Admin. Code 560-X-6-.09(1) ("Payment is available for abortions as provided under federal law. In the event the abortion does not meet the requirements of federal law, and the recipient elects to have the abortion, the provider may bill the recipient for the abortion.").

6

Until the termination of the provider agreement,[2] both of PPSE's offices participated in the State's Medicaid program and, therefore, were able to provide the aforementioned services for free or at reduced cost to Medicaid recipients in the State. PPSE provided services to Medicaid recipients one to two times per week. Over the past two fiscal years, PPSE received approximately $ 5,600 in state Medicaid funds. All parties agree that PPSE receives no Medicaid funding for abortion services.

## B. Videos Regarding Fetal-Tissue Donation

Beginning in mid-July 2015 and ending in early August, the Center for Medical Progress, an anti-abortion group, released a series of controversial videos on fetal-tissue donation programs operated by

---

2. The State of Alabama technically maintained a separate, yet identical, provider agreement for each PPSE facility; however, the agreement itself was between the State and PPSE. For clarity, the court will refer to these identical agreements as one provider agreement in this opinion.

certain abortion clinics.  These programs permit women who elect to have abortions to donate fetal tissue for medical research purposes.  At the PPFA-affiliated clinics that provide these services, the fetal tissue is collected by providers.  In some instances, procurement companies partner with the providers to collect and transmit tissue to researchers.  The parties do not dispute that no employee or representative of PPSE is depicted in these videos and that PPSE does not participate in fetal-tissue donation, and never has.

The videos feature individuals affiliated with the Center for Medical Progress posing as employees of a fake tissue-procurement company.  These individuals participate in a series of covertly filmed conversations with employees of PPFA and various PPFA-affiliated clinics.  The videos--nine in all--discuss two purported practices at issue here. First, the videos are clearly intended to give the impression that the depicted PPFA affiliates profit

from the 'sale' of fetal tissue. Second, the videos attempt to give the impression that providers at the affiliates that participate in fetal-tissue-donation programs alter abortion procedures in order to obtain intact--and therefore more 'valuable'--specimens.

Following the release of the videos, PPFA representatives criticized the tactics of the filmmakers and argued that the videos falsely portray the practices of those affiliates that engage in fetal-tissue donation. PPFA contends that much of what was omitted from the videos' recorded conversations with staff reflects that PPFA affiliates recover only their costs, and do not profit from their fetal-tissue-donation programs. An independent analysis of several of the videos, submitted by the plaintiffs, concludes that the released videos were "heavily edited" and therefore lack any legal "evidentiary value." Pls.' Ex. G, Reply Br. Mot. Prelim. Inj. 2, doc. no. 36-1.

The release of the videos led to strong and immediate backlash against PPFA and the clinics

affiliated with it.   Both PPSE and other affiliates report an increase in death threats and incidents of harassment.   Only two days after the release of the first video, the Governor of Indiana ordered an investigation into PPFA-affiliated clinics in that State.   Similar investigations were launched by politicians in Massachusetts, South Dakota, Pennsylvania, and Georgia.   Louisiana, Arkansas, Utah, Texas, and New Hampshire also responded with efforts to terminate affiliated clinics from their Medicaid programs.

### C. Termination of PPSE's Provider Agreement

On August 6, 2015, the Governor of Alabama sent a letter to PPSE to notify it that its provider agreement was being terminated.   The letter did not provide a reason for the termination and advised PPSE that the termination would go into effect 15 days later.   The Governor states in his briefing in this court that his decision to terminate was based on his viewing one of

10

the videos released by the Center for Medical Progress. The plaintiffs cite a statement the Governor made to the media, in which he contends that comments made in the video he viewed displayed a lack of respect for human life. The Governor states that he had no plan to terminate PPSE's provider agreement before viewing this video. Further, it is undisputed that, prior to the receipt of this letter, PPSE had not been made aware of any investigation into its medical or administrative practices by the Alabama Medicaid Agency.

## III. DISCUSSION

To determine whether issuance of a preliminary injunction is warranted, the court will first evaluate the plaintiffs' likelihood of success on the merits of their claims, then consider the threat of irreparable injury, and, finally, discuss whether the balance of harms and the public interest weigh in favor of or against an injunction. Because Doe has made a showing on her Medicaid Act claim adequate to warrant a

preliminary injunction, the court does not reach PPSE's
constitutional claims.

## A. Likelihood of Success on the Merits

### 1. Private Enforcement of the Free-Choice-of-Provider Right

In order to prevail on the merits, the plaintiffs
must, as a threshold matter, be entitled to pursue
relief under their stated cause of action.  The
Governor and the Acting Commissioner argue that the
free-choice-of-provider provision is not enforceable
under 42 U.S.C. § 1983, by either Medicaid providers or
by recipients.  This court finds to the contrary, at
least with respect to Doe, who is a recipient of
Medicaid benefits.[3]

---

3. Because the court finds that Doe has a private-
enforcement right, the court need not decide whether
PPSE also has such a right, on behalf of its recipient-
patients or on its own behalf.  See Silver v. Baggiano,
804 F.2d 1211, 1217 (11th Cir. 1986) (declining to
resolve whether § 1396a(a)(23) creates a right
enforceable by a provider since "Medicaid recipients do
have enforceable rights under § 1396a(a)(23), and an
actual recipient has made a motion to intervene in this
(continued…)

The federal Courts of Appeals to consider the issue, as well as other federal district courts, have reached the same conclusion: § 1396a(a)(23) creates a private right enforceable under § 1983. Planned Parenthood Ariz. Inc. v. Betlach, 727 F.3d 960, 965-68 (9th Cir. 2013), cert. denied, 134 S. Ct. 1283 (2014); Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962, 972-77 (7th Cir. 2012), cert. denied, 133 S. Ct. 2736 (2013), cert. denied, 133 S. Ct. 2738; Harris v. Olszewski, 442 F.3d 456, 460-65 (6th Cir. 2006); see also Planned Parenthood Gulf Coast, Inc. v. Kliebert, No. 3:15-cv-565, 2015 WL 6122984, at *18-19 (E.D. La. Oct. 18, 2015) (deGravelles, J.); Planned Parenthood Ark. & E. Okla. v. Selig, No. 4:15-cv-566, slip op. at 11-14 (E.D. Ark. Oct. 2, 2015) (Baker, J.); Women's Hosp. Found. v. Townsend, No. 07-711, 2008 WL 2743284, at *8

---

case"); see also Nutritional Support Servs., L.P. v. Miller, 826 F. Supp. 467, 468-70 (N.D. Ga. 1993) (Carnes, J.) (concluding that providers--the only plaintiffs--had no enforcement right under the free-choice-of-provider provision).

(M.D. La. July 10, 2008) (Brady, J.).  Although the Eleventh Circuit Court of Appeals has not explicitly held that the free-choice-of-provider provision creates a private right enforceable under § 1983, it suggested as much in Silver v. Baggiano, 804 F.2d 1211, 1216-18 (11th Cir. 1986) (noting, in remanding for the district court to consider in the first instance whether a provider had such a right, that the district court might not need to reach each issue, because "Medicaid recipients do have enforceable rights under § 1396a(a)(23), and an actual recipient has made a motion to intervene in this case"), abrogated on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 618 (2002).

These courts applied the three-step test articulated by the Supreme Court in Blessing v. Freestone, 520 U.S. 329 (1997), for determining whether a statutory provision can be enforced under § 1983: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff

14

must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." Id. at 340-41 (citations and internal quotation marks omitted).

With respect to the first factor, they explained that, in guaranteeing the free choice of provider to "any individual eligible for medical assistance," the free-choice-of-provider provision employs "individually focused terminology" that "unambiguously confer[s]" an "individual entitlement." Harris, 442 F.3d at 461 (citations omitted); see also Planned Parenthood Ariz., 727 F.3d at 966-67 (citing Ball v. Rodgers, 492 F.3d 1094, 1108 (9th Cir. 2007) ("While express use of the term 'individuals' (or 'persons' or similar terms) is not essential to finding a right for § 1983 purposes, usually such use is sufficient for that purpose.")); Planned Parenthood of Ind., 699 F.3d at 974 ("This language does not simply set an aggregate plan

15

requirement, but instead establishes a personal right to which all Medicaid patients are entitled."). The Supreme Court, too, has explained as much. O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 785 (1980) ("[The free-choice-of-provider provision] gives recipients the right to choose among a range of qualified providers without government interference." (emphasis omitted)).

As for the second factor, the courts that have ruled on this issue have held that the free-choice-of-provider right is "administrable and falls comfortably within the judiciary's core interpretive competence." Planned Parenthood of Ind., 699 F.3d at 974; see id. ("Planned Parenthood argues that a state infringes the free-choice-of-provider right when it excludes a provider from its Medicaid program for a reason other than the provider's fitness to render the medical services required. Whether this is the proper interpretation of § 1396a(a)(23) is a legal question fully capable of judicial resolution.");

see also Planned Parenthood Ariz., 727 F.3d at 967
("[W]hether the doctor is qualified ... may require []
factual development or expert input, but still falls
well within the range of judicial competence.   The
requirement could be established, for example, by a
combination of evidence as to the medical licenses the
doctor holds and evidence as to the licenses necessary
under state law to perform family planning services.");
Townsend, 2008 WL 2743284, at *8 ("[T]he plain language
of the provision is sufficiently clear to allow for
judicial enforcement.").

     The free-choice-of-provider provision also meets
the third Blessing requirement, because it is "couched
in mandatory, rather than precatory," language: a State
"must" provide recipients the freedom of choice.
Harris, 442 F.3d at 461 (quoting Blessing, 520 U.S. at
341); see also Planned Parthood Ariz., 727 F.3d at 967
(calling this conclusion "indubitabl[e]"); Planned
Parenthood of Ind., 699 F.3d at 974 ("[Section]
1396a(a)(23) is plainly couched in mandatory terms.");

17

_Townsend_, 2008 WL 2743284, at *8 ("[T]he language is mandatory ... .").

Thus, courts have found that the free-choice-of-provider right is "presumptively enforceable" under § 1983. See _Gonzaga Univ. v. Doe_, 536 U.S. 273, 284 (2002). Under _Gonzaga_, this presumption of enforceability could be overcome if Congress had foreclosed § 1983 lawsuits by recipients, either expressly or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with" private lawsuits. _Id_. at 284 n.4 (quoting _Blessing_, 520 U.S. at 341). But the three Courts of Appeals to consider the question all concluded that Congress had not expressly or impliedly foreclosed private-enforcement actions. _Planned Parenthood Ariz._, 727 F.3d at 968; _Planned Parenthood of Ind._, 699 F.3d at 975-76; _Harris_, 442 F.3d at 462.

This court is persuaded that these remarkably consistent holdings are correct. The fact that federal and state law provide for an administrative appeals

18

process does not prompt a different conclusion. Exhaustion of administrative remedies available under state law--by either Doe or PPSE--was not required before Doe could file suit in federal court. As she points out, the Eleventh Circuit, like every other circuit to consider the issue, has concluded that exhaustion is not required for claims under the Medicaid Act. See Alacare, Inc. North v. Baggiano, 785 F.2d 963, 965-67 (11th Cir. 1986) ("The evidence of a congressional preference for imposing an exhaustion requirement in Medicaid cases is simply inevident ... ." (applying Patsy v. Fla. Bd. of Regents, 457 U.S. 496 (1982)); see also Romano v. Greenstein, 721 F.3d 373, 376 (5th Cir. 2013); Roach v. Morse, 440 F.3d 53, 58 (2d Cir. 2006); Houghton ex rel. Houghton v. Reinertson, 382 F.3d 1162, 1167 n.3 (10th Cir. 2004); Talbot v. Lucy Corr. Nursing Home, 118 F.3d 215, 220 (4th Cir. 1997).

Further, it is relevant that the letter sent by the Governor was--as the court determines below--based on

19

an at-will termination clause in PPSE's provider agreement, and not any for-cause ground. Because the termination letter lacked any substantive basis for the termination of the provider agreement, it is questionable whether meaningful review could have been sought through the administrative process. The defendants' argument that the plaintiffs could have uncovered through the administrative appeal process the for-cause reason the defendants now retrospectively offer is unpersuasive. Their argument ignores the fact that the Governor did implicitly identify a basis for terminating the agreement, which was his contractual authority to terminate it at will, at any time, without giving any other reason. This basis for administrative action strikes the court as a fundamentally unappealable one, impervious to evidentiary rebuttal. Even if every factual allegation leveled against PPSE were disproven, the agency--believing that it was empowered to terminate a provider agreement without any

basis whatsoever in the conduct of the provider--would hold a trump card.

The defendants argue that a recent decision by the Supreme Court, <u>Armstrong v. Exceptional Child Ctr., Inc.</u>, 135 S. Ct. 1378 (2015), warrants reconsideration of the above precedents establishing that recipients have enforceable rights under the free-choice-of-provider provision.  However, <u>Armstrong</u> does not cast significant doubt on this now-well-established proposition.

<u>Armstrong</u> involved a challenge by providers to a different provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A) (the 'equal-access' provision), which requires state plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to

21

enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area ... ." 135 S. Ct. at 1382. The equal-access provision, the Court observed, "lacks the sort of rights-creating language needed to imply a private right of action," id. at 1387--that is, just the sort of language that the free-choice-of-provider provision does contain. See also Townsend, 2008 WL 2743284, at *8 (drawing the same contrast between § 1396a(a)(23) and § 1396a(a)(30)(A)); Planned Parenthood Gulf Coast, 2015 WL 6122984, at *18 (recognizing that the equal-access provision "lacks the rights-creating and individual-focused language so prominent in [the free-choice-of-provider provision]").

The Armstrong Court concluded that two aspects of the equal-access provision, considered together, "establish[ed] Congress's intent to foreclose equitable relief." 135 S. Ct. at 1385 (citation and internal quotation marks omitted). Only one of these factors

applies with any force to the free-choice-of-provider provision: that the remedy Congress affirmatively provided for a State's failure to comply with the provisions of the Medicaid Act was the withholding of funds by the Secretary of Health and Human Services. Id. (citing 42 U.S.C. § 1396c). Critically, however, the Court made clear that "[t]he provision for the Secretary's enforcement by withholding funds might not, by itself, preclude the availability of equitable relief."[4]  Id. (citing Va. Office for Prot. & Advocacy v. Stewart, 131 S. Ct. 1632, 1639 n.3 (2011) ("The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw

---

4. This enforcement provision applies to a number of other substantive provisions of the Medicaid Act, many of which have been repeatedly held to be privately enforceable under § 1983. See, e.g., Bontrager v. Ind. Family & Soc. Servs. Admin., 697 F.3d 604, 606-07 (7th Cir. 2012) (§ 1396a(a)(10)); Doe v. Kidd, 501 F.3d 348, 355-57 (4th Cir. 2007) (§ 1396a(a)(8)); S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 602-07 (5th Cir. 2004)(§ 1396a(a)(10)); Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 182-93 (3d Cir. 2004) (§§ 1396a(a)(8), 1396a(a)(10), 1396a(a)(15)); Gean v. Hathaway, 330 F.3d 758, 772-73 (6th Cir. 2003)(§ 1396a(a)(3)).

funds ... does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under Ex parte Young[, 209 U.S. 123 (1908)]." (citation and internal quotation marks omitted))). Rather, the Court held, "the express provision of an administrative remedy," "when combined with the judicially unadministrable nature" of the equal-access provision, demonstrated that private enforcement was precluded. Armstrong, 135 S. Ct. at 1385 (emphasis added).

The equal-access provision at issue in Armstrong and the free-choice-of-provider provision at issue here could hardly be more different with respect to judicial administrability. "It is difficult to imagine a requirement broader and less specific than" the equal-access provision's "judgment-laden standard." Id. By contrast, the free-choice-of-provider provision articulates "concrete and objective standards for enforcement." Planned Parenthood Ariz., 727 F.3d at

24

967 (citation omitted).  For example, to adjudicate a claim under the equal-access provision, a court might be required to determine whether a particular procedure was "necessary to safeguard against unnecessary utilization" of covered care--a near-impossible task. 42 U.S.C. § 1396a(a)(30)(A).  To decide a claim under the free-choice-of-provider provision, however, does not demand that the court obtain a crash-course in health-systems administration; determining that a provider is "qualified to perform [a] service ... and undertakes to provide [] such service[]" is well within a court's competence.  Id.  If, as the defendants contend, States had free rein to define 'qualified' in whatever ways they wished, deciding a claim under the free-choice-of-provider provision might indeed be a more difficult, and perhaps 'judgment-laden' task. However, the court rejects this expansive reading; "qualified to perform the service or services required" means just what the plain language says: having "competency and professional standing as a medical

25

provider generally." <u>Planned Parenthood of Ariz.</u>, 727

F.3d at 967-69; <u>Planned Parenthood of Ind.</u>, 699 F.3d at

978 ("If the states are free to set any qualifications

they want--no matter how unrelated to the provider's

fitness to treat Medicaid patients--then the

free-choice-of-provider requirement could be easily

undermined by simply labeling any exclusionary rule as

a 'qualification.' This would open a significant

loophole for restricting patient choice, contradicting

the broad access to medical care that § 1396a(a)(23) is

meant to preserve.").

Doe, as a recipient of Medicaid benefits and a

patient of PPSE, has pleaded a viable cause of action.

She is entitled to bring an enforcement action under

§ 1983 to vindicate her right to receive care from any

qualified (and willing) provider under the

free-choice-of-provider provision.

This conclusion is particularly well-supported by

the statute in the context of the family-planning

services at issue here. Although the Medicaid Act does

permit States to limit a recipient's free choice of provider in certain ways when she is enrolled in a managed-care plan,[5] the statute is clear that the State still "shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title," which pertains to "family planning services and supplies." 42 U.S.C. § 1396a(a)(23)(B).  Congress saw fit to identify family planning as the area of medical care with respect to which a recipient's free choice of provider was most critical.  It is not hard to imagine why--just as business owners do, healthcare providers and Medicaid recipients have widely varying "honest conviction[s]" about the appropriateness of different family-planning methods.  See Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2779 (2014) (citation omitted).  Congress presumably intended to ensure that women who receive Medicaid benefits would be able to

---

    5. Neither party has suggested that Doe is enrolled in such a plan.

receive care from a provider whose perspectives on family planning were aligned with her own.

One final point bears discussing. The Governor and the Acting Commissioner argue that no free-choice-of-provider claim can be brought, whether by a provider or a recipient, when the State terminates an individual provider agreement pursuant to § 1396a(p)(1) (the 'exclusion' provision). This is, they emphasize in their brief, because such terminations are an <u>exception</u> to the requirement that States must give recipients a free choice of qualified providers.[6]   The court understands this argument as

---

6. For the first time at oral argument, the defendants hinted at a different argument--that in terminating PPSE under the exclusion provision, they have "effectively" rendered it (or recognized it to be) unqualified for purposes of the free-choice-of-provider provision. Tr. Hr'g Mot. Prelim. Inj. 26, doc. no. 44.

However, the defendants cannot have it both ways. If they rely on the exclusion provision as an exception to the free-choice-of-provider provision, they are necessarily conceding that an exception is necessary because the rule applies; that is, because PPSE cannot be terminated as unqualified. Then, the court must determine (as it does, below) whether Doe has a right (continued...)

follows: The exclusion provision permits States to terminate a provider agreement for at least some reasons other than that the provider is not 'qualified.' When a State terminates a qualified provider for one of these reasons, the argument goes, a recipient is not entitled to choose to receive covered care from that provider, despite the fact that it is qualified. This is true, but of little help to the defendants' case. There plainly are some reasons that a State may terminate a provider agreement under the exclusion provision other than the provider being unqualified. (Whether a State may do so based on reasons wholly unrelated to the purposes of the

---

to challenge PPSE's termination under the exclusion provision, and whether the termination was proper under the terms of that provision.

If instead defendants were to contend that they terminated PPSE because it was unqualified, the court would have to consider whether Doe could challenge the termination on those grounds, and whether the State is free to determine, without giving any reason related to the services it provides, that PPSE is unqualified. As the 6th, 7th, and 9th Circuits have held, the answers to these questions are clearly "yes" and "no."

Medicaid Act will be discussed below.)  Additionally,
providers who have been <u>properly</u> excluded from a
State's Medicaid program under the exclusion provision
do fall within an "exception[]" to a recipient's right
to choose any qualified provider.  <u>Planned Parenthood
Ariz.</u>, 727 F.3d at 973. But here, Doe does not argue
that the free-choice-of-provider provision entitles her
to choose a provider that was <u>rightfully</u> excluded for,
say, claim fraud under 42 U.S.C. § 1320a-7a(a) (a
ground for exclusion by a State under the exclusion
provision), yet is nonetheless fully qualified to
provide her care; that grievance would not be
actionable under the free-choice-of-provider provision.
Rather, Doe alleges that her qualified provider of
choice, PPSE, was <u>wrongfully</u> removed from the pool of
providers among whom she has a right to choose.
Indeed, Doe argues not only that there exists no basis
in fact for PPSE's termination, but also that PPSE was
excluded on a basis which, as a matter of law, falls
outside the exclusion-provision exception.

If a State could defeat a Medicaid recipient's right to select a particular qualified healthcare provider merely by terminating its agreement with that provider on an unlawful basis, the right would be totally eviscerated. If the Governor and the Acting Commissioner were correct that allegedly unlawful terminations of provider agreements could not be challenged by recipients pursuant to the free-choice-of-provider provision, that provision's "<u>individual</u> entitlement," the "personal right" it gives recipients, would be an empty one.[7]   <u>Planned Parenthood</u>

_____

7. <u>O'Bannon</u> is not to the contrary. In <u>O'Bannon</u>, the Court held that the free-choice-of-provider provision did not give residents of a nursing home a due-process right to a pre-deprivation hearing when the State, after an audit, determined that their nursing home no longer met specific federal "statutory and regulatory standards for skilled nursing facilities" and terminated its Medicaid provider agreement. 447 U.S. at 775-76, 785. <u>O'Bannon</u> is inapposite here for two reasons. First, as the Seventh Circuit put it, "[t]his is not a due-process case. Planned Parenthood and its patient[] are not suing for violation of their <u>procedural</u> rights; they are making a <u>substantive</u> claim that [the termination of the provider agreement] violates [the free-choice-of-provider provision]." <u>Planned Parenthood of Ind.</u>, 699 F.3d at 977. Even more (continued...)

of Ind., 699 F.3d at 974; Harris, 442 F.3d at 461
(citation omitted).   See also Pls.' Ex. S, United
States' Statement of Interest in Planned Parenthood
Gulf Coast, Inc. v. Kliebert 7 n.3, doc. no. 7-1 ("[The
free-choice-of-provider provision] is violated whenever
a beneficiary is denied her right to receive covered
Medicaid services from 'any' qualified provider of her
choice willing to provide the services; it does not
matter whether that provider was excluded from the
Medicaid program on an individualized or class-wide
basis.").


### 2. At-Will Termination

---

basically, as discussed in greater detail below, PPSE's
termination letter included no basis for the decision
that could even plausibly be construed as relating to
its "competency and professional standing as a medical
provider generally." Planned Parenthood Ariz., 727
F.3d at 969.  O'Bannon held that a Medicaid recipient
has no due-process right to a hearing before his
unqualified nursing home's agreement is terminated; it
does not stand for the proposition that any time a
State terminates a Medicaid provider agreement, for any
reason or for no reason at all, that decision is
insulated from substantive review at the behest of
recipients.

Although the parties in this case have presented significant evidence regarding the motivation for and validity of the Governor's decision to terminate PPSE's provider agreement, the court need not delve into it. This is because the termination letter sent by the Governor was clearly based on the at-will termination provision in PPSE's provider agreement.

The letter sent by the Governor to PPSE did not provide a substantive reason or statutory basis for the termination of its provider agreement. Rather, it simply stated that "[p]ursuant to the Alabama Medicaid Agency Provider Agreement under section IV. Term, Amendment, and Termination, the Agency is exercising its ability to terminate the existing agreement(s) with Planned Parenthood Southeast, Inc. with fifteen (15) days written notice. The termination of the provider agreement(s) with Planned Parenthood Southeast, Inc. will be effective fifteen (15) days after receipt of this letter." Pls.' Ex. 1, doc. no. 1-1.

Section IV of the provider agreement sets forth two different methods of termination. First, it sets forth an at-will termination provision: "Either party may terminate this Agreement by providing the other party with fifteen (15) days written notice." Defs.' Ex. 16, at 24, doc. no. 28-16. Second, it sets forth a for-cause termination provision: "MEDICAID may immediately terminate the Agreement for cause if the Provider is excluded from the Medicare or Medicaid programs for any reason, loses its licenses or certificates, becomes ineligible for participation in the Medicaid program, fails to comply with the provisions of this Agreement, or if the Provider is or may be placing the health and safety of recipients at risk." Id. at 5.

Along with the failure to articulate any specific cause for the termination, the 15-day delay clearly indicates that the Governor and the Acting Commissioner terminated PPSE's provider agreement not under the for-cause termination provision, but instead under the at-will termination provision. This assessment is

34

corroborated by the fact that the letter sent to PPSE would have been inadequate to effectuate a for-cause termination, because it failed to provide the notice required by federal law.[8]   "In order to exclude a provider under [the exclusion provision], a state must give the provider to be excluded notice of the state's intent to exclude, 42 C.F.R. § 1002.212 ... ." <u>Planned Parenthood Ariz., Inc. v. Betlach</u>, 899 F. Supp. 2d 868, 882 (D. Ariz. 2012) (Wake, J.).   Specifically, § 1002.212 requires States to give providers whose agreements are terminated "notification consistent with subpart E of part 1001 of this chapter," which in turn requires that such notice include "the basis of the exclusion."   42 C.F.R. § 1001.2002(c).   Although the Governor made public statements via Twitter regarding

_____

8. This failure to provide adequate notice of a for-cause ground for termination illustrates vividly why PPSE's failure to pursue an administrative appeal has no bearing on the outcome of this case.   The purpose of giving a provider notice of the reason for termination of its agreement is obvious: so that it can submit evidence and argument to meaningfully contest the agency's determination.   When no reason has been articulated, an appeal becomes a sham.

his decision to terminate PPSE's provider agreement, 'tweets' are plainly not an acceptable form of notice.

Hence, the narrow question before the court is whether the Medicaid Act allows a State to terminate a provider agreement based on no reason other than the existence of a contractual at-will termination provision like the one in PPSE's. The answer to that narrow question is "no."

The Governor and the Acting Commissioner argue that Alabama is empowered to terminate Medicaid provider agreements on any basis recognized under state law (including, as relevant in this case, state contract law). This authorization, they suggest, comes from the first clause of the exclusion provision, which states: "In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in [Medicare under the for-cause bases listed in] section

36

1320a-7, 1320a-7a, or 1395cc(b)(2) of this title." 42 U.S.C. § 1396a(p)(1) (emphasis added).

However, this clause of the exclusion provision does not give States carte blanche; the defendants "read[] the phrase for more than it's worth." Planned Parenthood of Ind., 699 F.3d at 979. It is true that States have the "authority to suspend or to exclude providers from state health care programs for reasons other than those upon which the Secretary of [Health and Human Services] has authority to act." Guzman v. Shewry, 552 F.3d 941, 949 (9th Cir. 2009). But this authority is not unbounded. As the Seventh and Ninth Circuits have concluded, the exclusion provision is a "standard savings clause [which] 'signals only that what follows is a non-exclusive list' and 'does not imply that the states have an unlimited authority to exclude providers for any reason whatsoever.'" Planned Parenthood Ariz., 727 F.3d at 972 (citing Planned Parenthood of Ind., 699 F.3d at 979). "[T]he Medicaid Act itself must provide that 'other' authority, just as

it supplies the 'authority' covered by the rest of the subsection.   Were it otherwise--were states free to exclude providers as they see fit--then the bulk of § 1396a(p)(1) itself would be unnecessary, as the 'authority' it supplies would be superfluous." <u>Planned Parenthood Ariz.</u>, 727 F.3d at 972.

The Governor and the Acting Commissioner's broad reading of the exclusion provision is therefore "not plausible." <u>Planned Parenthood Ariz.</u>, 899 F. Supp. 2d at 882. "If a state could rely on [the exclusion provision] to exclude ... providers for any non-arbitrary reason, then the remainder of the exceptions, which carefully set forth circumstances under which the Secretary and states have authority to exclude providers, would be unnecessary.   Such an interpretation undermines the cardinal rule of statutory interpretation that no provision [of a statute] should be construed to be entirely redundant." <u>Id</u>. at 882-83 (citation and internal quotation marks omitted) (discussing, as an example, 42 U.S.C.

§ 1396n(b)(4), which allows the Secretary of Health and Human Services to waive the free-choice-of-provider requirement, but only when a State limits choice based on standards that "are consistent with access, quality, and efficient and economic provision of covered care and services").

The Governor and the Acting Commissioner also cite the regulation implementing the exclusion provision and the provision's legislative history in support of their claim.   42 C.F.R. § 1002.2 states: "Nothing contained in this part should be construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or period authorized by State law."   However, a close reading reveals that "[t]hat provision is only a limitation on interpretation of the referenced 'part' of the regulations--Title 42, Chapter V, Subchapter B, Part 1002--which does not encompass the free-choice-of-provider requirement."   <u>Planned Parenthood Ariz.</u>, 727 F.3d at 972 n.8.   Although the legislative history of the provision includes a note

39

stating that it "is not intended to preclude a State from establishing, under State law, any other bases for excluding individuals or entities from its Medicaid program," S. Rep. No. 100-109, at 20 (1987), reprinted in 1987 U.S.C.C.A.N. 682, 700, this note makes clear only that a State may establish other bases for exclusion, not what limits exist on a State's discretion in doing so.  The legislative history itself suggests those limits, in explaining that the "overarching purpose of [the exclusion provision] is to grant authority to exclude a provider based on the provider's quality of services ... ."  Planned Parenthood Ariz., 899 F. Supp. 2d at 882-83 (citing S. Rep. No. 100-109 (1987), at 1-2, reprinted in 1987 U.S.C.C.A.N. 682, 700).

If a State were free to terminate a provider agreement for any reason with a basis in state law, recipients' free-choice-of-provider rights would be "greatly weakened," and "subject to state policies and politics having nothing to do with the Medicaid

program." <u>Id</u>.   An at-will termination clause might (or might not) defeat a provider's right to challenge such a decision on appeal, but it has no effect on a recipient's rights; after all, "Jane Doe[] [is] not [a] part[y] to the agreement[] cited." <u>Planned Parenthood Ark. & E. Okla.</u>, slip op. at 25.

Because the enumerated statutory bases for excluding providers cross-referenced in the exclusion provision involve "various forms of malfeasance such as fraud, drug crimes, and failure to disclose necessary information to regulators," <u>Planned Parenthood of Ind.</u>, 699 F.3d at 979, the provision's 'any other authority' clause, when "[r]ead in context, ... reaffirm[s] state authority to exclude individual providers pursuant to analogous state law provisions relating to fraud and misconduct," but does not give States license to terminate provider agreements "on grounds unrelated to medical competency <u>or</u> legal and ethical propriety." <u>Planned Parenthood Ariz.</u>, 727 F.3d at 972.

41

The state-law ground on which the Governor terminated PPSE's provider agreement--the at-will termination clause--falls well outside the range of grounds germane to the purposes of the Medicaid Act. See also Pls.' Ex. S, United States' Statement of Interest in Planned Parenthood Gulf Coast, Inc. v. Kliebert 2, doc. no. 7-1 ("[States] cannot evade the statutory mandate of [the 'free-choice-of-provider' provision] through the simple expedient of incorporating 'at-will' termination provisions into their Medicaid provider agreements.   To conclude otherwise would not only strip the Medicaid Act's free-choice-of-provider provision of all meaning, but also would contravene clear congressional intent to give Medicaid beneficiaries the right to receive covered services from any qualified and willing provider.").

In sum, Doe is likely to prevail on the merits of her Medicaid Act claim.

### 3. For-Cause Termination

Had this termination been for cause, it would have been necessary for the court to consider whether the reasons of which PPSE would have been given notice were sufficient to support the termination of its provider agreement. Because the Governor and the Acting Commissioner have retrospectively (and belatedly) articulated a for-cause ground that they believe would support such an action, the court turns now, briefly, to whether, on the record before the court, they would have been justified in terminating the agreement on that basis.

In their brief opposing the motion for a preliminary injunction, the defendants identified the following ground for excluding PPSE: that it is an "entity that the [State] determines ... has furnished ... services to patients ... of a quality which fails to meet professionally recognized standards of health care." 42 U.S.C. § 1320a-7(b)(6)(B). Specifically, they assert that statements in a video

43

purporting to describe the practices of some PPFA affiliates with respect to fetal-tissue donation run afoul of "safeguards" prescribed by the American Medical Association.  See Am. Med. Assoc. Code on Med. Ethics, Op. 2.161 (last updated June 1996) (doc. no. 28-7).  According to the defendants, this video gave the Governor reason to be concerned that (1) "decisions regarding the technique used to induce abortion" by practitioners at some PPFA affiliates were being based in part on a desire to obtain intact tissue samples and therefore not exclusively on "concern for the safety of the pregnant woman," and (2) that "fetal tissue is [being] provided in exchange for financial remuneration above that which is necessary to cover reasonable expenses."  Id.

If there was any indication--allegation, even--that PPSE had itself provided substandard care in these or any other ways, various questions would arise with respect to the applicability of § 1320a-7(b)(6)(B) regarding the quality of care.  The court would be

44

compelled to examine a number of issues: the amount of evidence required to terminate for failure to meet professionally recognized standards of healthcare, the type of evidence such a showing would require, whether abortion procedures had actually been altered in such a way as to pose any additional risks to women, and whether providers had actually received remuneration in excess of reasonable expenses.

However, the court has not assessed the strength of the 'evidence' in the videos because it is beside the point. PPSE states that it does not engage in fetal-tissue donation at all. It offers evidence to this effect, and the defendants do not contest the point. Rather, they argue that the practices-- specifically, (alleged) ethical violations--of separately incorporated organizations in other regions with which PPSE is affiliated are properly attributed to PPSE. The court disagrees.

First, when considered together, the exclusion provision (§ 1396a(p)(1)) and § 1320a-7(b)(6)(B), the

for-cause ground cited by the defendants, make clear that the "entity" that "a State may exclude" must be the <u>same</u> "entity that the [State] determines ... has furnished ... services to patients ... of a quality which fails to meet professionally recognized standards of health care." This is because the exclusion provision authorizes the State to exclude "any ... entity" if the Secretary of Health and Human Services "could exclude <u>the</u> ... entity under ... section 1320a-7 ... ." (emphasis added). It is a basic principle of legislative drafting that the definite article ("the") is used in place of "such" to mean "the previously mentioned." <u>See</u> Lawrence E. Filson & Sandra L. Strokoff, The Legislative Drafter's Desk Reference 228 (2d ed.). It is evident from the termination letter that the 'entity' the State has "exclude[d]" is PPSE--the entity with which it entered into, and then terminated, a provider agreement. <u>See</u> § 1396a(p)(3) (defining the term "exclude" to mean "the refusal to enter into or renew a participation agreement or the

termination of such an agreement"). Therefore, the termination is authorized by the provision the State cites only to the extent that this entity--PPSE--has furnished substandard care.

Second, when § 1320a-7(b)(6)(B) is read in the context of other enumerated for-cause termination grounds, it is apparent that it was intended to apply to only services furnished by the provider itself, and not to any services furnished by affiliates. Another provision does permit the exclusion of an entity based on affiliation, but only when the affiliated person--who must have been sanctioned under the Medicaid Act--has an ownership or control interest in the entity or is an officer, director, agent, or managing employee of the entity. 42 U.S.C. § 1320a-7(b)(8). Congress's inclusion of that provision strongly suggests that § 1320a-7(b)(6)(B) was not intended to allow for the termination of one entity's agreement on the basis of the infractions of another party in the absence of ownership, control, management,

47

or an agency relationship.[9]   The defendants do not claim, and the evidence does not suggest, that PPSE has such a close connection with any of the affiliates depicted in the video.  See also Planned Parenthood Ark. & E. Okla., slip op. at 27-28 (rejecting the "contention that Planned Parenthood Federation of America and its affiliates function as a unified whole, and thus, that the acts of one affiliate may be attributed to all other affiliates").

The Governor and the Acting Commissioner also seek to place the policies of PPFA at issue, arguing that because PPSE has "agree[d] to certain standards and policies which are contained in the by-laws of PPFA[,]" Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc., 498 N.E.2d 1044, 1048-49

_____

9. Section 1320a-7(b)(8), unlike most of the other permissive for-cause exclusion grounds enumerated in § 1320a-7(b), applies to only those entities controlled by a sanctioned "individual"–-not "individual or entity."  However, this strengthens rather than weakens the conclusion that Congress did not intend to allow for exclusion in cases where an entity is controlled in part by a sanctioned entity.  Had the drafters of the statute intended to do so, they knew how.

48

(Mass. 1986), PPFA's involvement in the allegedly unethical practices of other affiliates is attributable to PPSE and constitutes cause to exclude it under § 1320a-7(b)(6)(B). This might be a persuasive argument if the defendants had claimed--much less demonstrated--that PPFA had adopted and enforced a policy _requiring_ that all affiliates engage in fetal-tissue donation, alter abortion procedures to better preserve intact specimens, and accept compensation in excess of costs. But they have argued no such thing. Even construing the defendants' factual allegations generously--and setting aside the question of evidentiary support--they suggest at most that PPFA has supported the decisions of some affiliates to engage in these practices. There is no evidence that PPFA requires affiliates to engage in fetal-tissue donation at all, much less in unethical donation practices. What PPFA _permits_ other affiliates to do

49

therefore has no bearing on PPSE, which, to reiterate,
has elected not to engage in fetal-tissue donation.[10]

---

    10. The defendants reference a letter from the
president of PPFA to Congress, which they argue
"underscores the unity of the organization." Defs.'
Br. in Opp'n 37, doc. no. 29 (citing Defs.' Ex. 8, at
3, doc. no. 28-8). But the letter does not help their
case; it makes clear that PPFA has "policies and
practices that guide the affiliates that offer tissue
donation services." Id. These policies and practices
are inapplicable to PPSE, which does not.

    Nor does the odd assortment of cases cited in the
defendants' brief, all of which deal with corporate
relationships not applicable here, aid their cause.
None of these decisions stands for the proposition that
one corporation can be held responsible for the
policies of an umbrella organization regarding a
practice that other affiliated corporations engage in.
In re Phenylpropanolamine (PPC) Prods. Liab. Litig.,
344 F. Supp. 2d 686, 691-92 (W.D. Wash. 2003)
(Rothstein, J.), discusses whether a court can obtain
personal jurisdiction over a parent corporation based
on the subsidiary corporation's forum contacts.
Moreover, In re Phenylpropanolamine itself states that
the contacts of a subsidiary will not be imputed to the
parent simply because of the parent's "articulation of
general policies and procedures." Id. (citing United
States v. Bestfoods, 524 U.S. 51, 72 (1998). Bowoto v.
Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1237 (N.D.
Cal. 2004) (Illston, J.), which concerns piercing of
the corporate veil for tort-liability purposes, is
likewise concerned with attribution of a subsidiary's
acts to the parent corporation. In the present case,
there is nothing in the record to show that PPSE and
PPFA bear a subsidiary-parent relationship. See
(continued…)

50

Hence, on the record before the court, Doe would be likely to succeed on her claim that the Governor and the Acting Commissioner had no cause to exclude PPSE from the State's Medicaid program under § 1320a-7(b)(6)(B).

## B. Irreparable Injury

On her Medicaid Act claim, Doe argues that she faces irreparable injury without an injunction. She has made a showing of a substantial threat of irreparable injury sufficient to satisfy the preliminary-injunction standard. Because she has made

---

Bestfoods, 524 U.S. at 61 (explaining that "parent corporation[s] [are] so-called because of control of ownership of another corporation's stock"). Browning-Ferris Indus. of Cal., Inc., No. 32-RC-109684, 2015 WL 5047768, at *1-2 (N.L.R.B. Aug. 27, 2015), is no more on point, in that it involves the statutorily derived and therefore inapplicable "standard for assessing joint-employer status under the National Labor Relations Act." Finally, the trademark cases cited in the defendants' brief merely stand for the proposition that affiliates who share a mark with a national organization will generally have consistent policies and standards.

such a showing, it is unnecessary to consider any
irreparable harm to PPSE.[11]

The plaintiffs rely on Doe's inability to continue
receiving medical care at PPSE, specifically at the
Birmingham clinic, where she goes every three months
for a Depo-Provera shot. Doe states that she "strongly

---

11. Because Doe has shown virtually certain success
on the merits of her Medicaid Act claim, her required
showing as to irreparable injury may be lessened. The
former Fifth Circuit used a "sliding scale" standard
when evaluating whether to issue a temporary
restraining order or preliminary injunction. See Siff
v. State Democratic Executive Comm., 500 F.2d 1307,
1309 (5th Cir. 1974) (explaining that "a sliding scale
must be applied in considering the probability of
plaintiffs' winning on the merits and plaintiffs'
irreparable injury in the absence of interlocutory
relief"); see also State of Tex. v. Seatrain Int'l,
S.A., 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the
four prerequisites has a fixed quantitative value.
Rather, a sliding scale is utilized, which takes into
account the intensity of each in a given calculus.").
The Eleventh Circuit has adopted as precedent all
decisions of the former Fifth Circuit rendered prior to
October 1, 1981, and all Former Fifth Circuit Unit B
and non-unit decisions rendered after October 1, 1981.
See Stein v. Reynolds Secur., Inc., 667 F.2d 33, 34
(11th Cir. 1982); Bonner v. City of Prichard, 661 F.2d
1206, 1207 (11th Cir. 1981) (en banc). While the
Eleventh Circuit has not explicitly referred to this
sliding-scale standard, even a more rigid requirement
that movants meet a certain threshold as to each prong
of the test--does not demand a different result.

prefer[s]" receiving care from PPSE, as opposed to from a private doctor.  Pls.' Ex. 1, Declaration of Jane Doe 2, doc. no. 31-1.  She further states that she would try to locate another provider if she could not obtain covered care there, but does not know where she would go.  She is due to receive another contraceptive shot this month.   PPSE represents that, due to the termination, it is being forced to turn away Medicaid patients.   If Doe attempted to return to PPSE to receive her shot, she would be turned away.

The Governor and the Acting Commissioner argue that Doe can entirely mitigate any harm by seeking care elsewhere.   In particular, they point to the existence of numerous Medicaid providers within five miles of PPSE's Birmingham clinic.   As the Seventh Circuit recognized in Planned Parenthood of Indiana, however, "[t]his argument misses the mark."   699 F.3d at 981. In that case, the court affirmed the district court's issuance of a preliminary injunction on the plaintiffs' Medicaid Act claim, reasoning that the fact "[t]hat a

53

range of qualified providers remains available is beside the point. [The 'free-choice-of-provider' provision] gives Medicaid patients the right to receive medical assistance from the provider of their choice without state interference ... ." Id. at 981. Although Doe can seek family-planning services elsewhere, this does not diminish the injury that will result from her inability to see the provider of her choice. See Planned Parenthood Ark. & E. Okla., slip op. at 22 (concluding, in a similar case, that "denial of ... freedom of choice is more likely than not exactly the injury Congress sought to avoid when it enacted [the free-choice-of-provider provision]"). That Doe will be forced to seek out a replacement provider within such a short span of time--and may even face a long wait for an appointment, making it difficult to adhere to her current Depo-Provera regimen--makes this harm especially imminent.

Further, there is no adequate remedy at law for this injury. The Supreme Court has stated that the

lack of any legal remedy is a central consideration in the irreparable-injury analysis. See Sampson v. Murray, 415 U.S. 61, 88-89 (1974). Without the injunction, Doe would be forced to stop seeking services from a provider with whom she is comfortable, and she might well not be able to identify another provider with whom she could forge such a relationship. Such an injury is clearly not susceptible to monetary relief. Doe has therefore demonstrated that she faces a substantial threat of irreparable injury absent the issuance of an injunction.

## C. Other Preliminary-Injunction Considerations

The balance of harms and the public interest likewise favor issuance of a preliminary injunction. As discussed above, Doe will face significant harm if an injunction does not issue. The Governor and the Acting Commissioner rely on the videos' claims that the fetal-tissue donation programs of some PPFA affiliates breach ethical standards to argue that the continued

funding of PPSE through taxpayer dollars would itself cause an injury to the State.  This argument is not persuasive because the defendants do not dispute the plaintiffs' assertions--or the evidence in the record--that PPSE does not engage in fetal-tissue donation.  The practices purported to be portrayed by the videos, therefore, cannot possibly cause any harm to the State or to Alabama taxpayers.

The defendants also assert that the issuance of an injunction would undermine the respect due the Governor's decision to terminate the provider agreement.  The defendants offer no legal support for this argument; regardless, such an injury cannot outweigh the injury to Doe discussed above.

Moreover, the issuance of an injunction is in the public interest.  In particular, an injunction would reinforce Doe's right to seek family-planning services from the qualified provider of her choice--a right explicitly and emphatically protected under federal law.

In sum, the plaintiffs have satisfied the requirements for the issuance of a preliminary injunction on Doe's Medicaid Act claim.


## IV. SCOPE OF RELIEF

Because Doe has satisfied her burden to show that entry of a preliminary injunction is warranted, the court now turns to the appropriate scope of that injunction. Specifically, the court must consider whether to order the State to resume Medicaid payments to PPSE to cover the cost of Doe's care alone--as defendants contend is appropriate, see Planned Parenthood Ark. & E. Okla., slip op. at 17 ("[I]n the absence of class certification, the preliminary injunction may properly cover only named plaintiffs." (citation omitted)), or to reinstate the State's provider agreement with PPSE such that PPSE would be reimbursed for care provided to any Medicaid recipient--as PPSE urges the court to do.

Based on the evidence currently in the record and the representations of the parties during an on-the-record telephonic hearing on this issue, the court finds that, at least at present, the reinstatement of the provider agreement is necessary to guarantee meaningful relief to Doe.  The Supreme Court has recognized the general principle that injunctive relief should not be "more burdensome to the defendant than necessary to provide complete relief to ... plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702 (1979); see also Lion Health Servs., Inc. v. Sebelius, 635 F.3d 693, 703 (5th Cir. 2011) (citing Yamasaki for this rule).  Hence, the question is this: would an injunction that does not reinstate the provider agreement afford Doe the meaningful--and urgent--relief she requires.  The answer is apparently "no."

The Acting Commissioner, who is charged with administering the state's Medicaid plan, has indicated that the Alabama Medicaid Agency has sought but not yet

identified a logistical means of allowing PPSE to file for and receive Medicaid reimbursements for Doe's care while its provider agreement remains, for purposes of all other recipients, nonexistent. <u>See</u> Official Tr. October 14, 2015 Telephone Conference Proceedings 11, doc. no. 57. As of now, then, enabling PPSE to file reimbursement requests for Doe's care will require the agency to reauthorize PPSE in its reimbursement system with respect to all recipients. Since the defendants have not been able to explain to the court how, as a practical matter, limited relief is feasible, and have stated that it is <u>not</u> immediately feasible, the court is presented with no concrete way in which to tailor the injunction more narrowly while still providing meaningful, immediate relief to Doe.

Moreover, the reinstatement of the provider agreement is no "more burdensome than necessary" to ensure that Doe's provider of choice, PPSE, is actually reimbursed for her care (and thus that she is actually able to obtain that care). Practically speaking,

compliance with an injunction limited to Doe will, the State says, be no less burdensome than compliance with an injunction that covers all recipients. Because "identical relief [is] inevitable to remedy the individual plaintiff's rights," Zepeda v. I.N.S., 753 F.2d 719, 729 n.1 (9th Cir. 1983) (opinion of Wallace, J.) (describing the crux of the holding of Bailey v. Patterson, 323 F.2d 201 (5th Cir. 1963)), the court will enter the injunction requested by the plaintiffs, at least until such time as the defendants can assure the court of their ability to reimburse PPSE for Doe's care without reinstating the provider agreement.[12]

In so doing, the court notes that, since the hearing on the motion for a preliminary injunction, Doe

---

12. Aside from the logistical barriers that would prevent Doe from receiving care under a grant of relief that did not in practice extend to all recipients, the plaintiffs have suggested that the State could not resume Medicaid payments to PPSE only as to Doe without running afoul of federal Medicaid law, state law, or both. Because such a remedy is, as of now, functionally indistinct from a broader injunction, it is unnecessary to consider whether limited relief would be permissible under the applicable legal regimes.

has filed a motion to certify a class of Medicaid recipients who wish to receive care from PPSE (doc. no. 54). This motion, if granted, would obviate the question whether relief should be tailored, if it even can be practically, to cover only Doe. See, e.g., Hollon v. Mathis Indep. Sch. Dist., 491 F.2d 92, 93 (5th Cir. 1974) (recognizing that, had a class been certified, injunctive relief restraining enforcement of a regulation as to all individuals, rather than as applied to named plaintiff, would have been appropriate); Soto-Lopez v. N.Y. City Civil Service Comm'n, 840 F.2d 162, 168 (2d Cir. 1988) (explaining that "relief of general application" is appropriate where a plaintiff class has been certified, and considering whether such relief was available absent a class). Because certification of a class would provide an additional basis for injunctive relief which benefits recipients other than Doe, the court will set

an expedited briefing schedule on Doe's motion in a separate order.[13]

Finally, the parties both agree that the questions answered here--that the termination of PPSE's provider agreement was at-will, and that such at-will terminations are not valid under the Medicaid Act--are essentially pure questions of law to which no additional evidence would be relevant. This is significant for two reasons. First, although the court is presently granting only a motion for a preliminary injunction, there is no possibility that additional evidence will alter its conclusion at the permanent injunction and declaratory relief stage, so the caution that should normally accompany a preliminary injunction that might be vacated once additional evidence is considered is not required here. See Bresgal v. Brock,

_____

13. Additionally, based on the current record, the court is of the belief that the plaintiffs are likely to prevail on their motion for class certification. In making this observation, the court recognizes that it has not heard all of the evidence and, accordingly, does not predict the eventual outcome of the motion.

843 F.2d 1163, 1169 (9th Cir. 1987) (recognizing that, at the preliminary injunction stage, the fact that a court had not "ruled on substantive issues in the case, but had only determined that the plaintiff had a 'fair chance' of prevailing on the merits" counseled against a grant of broad relief). Relatedly, because the only attribute of Doe relevant to the court's resolution of this claim is one that she shares with all those covered by the injunction--namely, that she is a Medicaid recipient who wishes to receive covered care from PPSE--there is no possibility that additional evidence would reveal that the injunction would be any less appropriately entered with respect to another recipient not presently a party to the case. Cf. Soto-Lopez, 840 F.2d at 168 ("When a state statute has been ruled unconstitutional, state actors have an obligation to desist from enforcing that statute. Thus, when it has been held unconstitutional to deny benefits to otherwise qualified persons on the ground they are members of a certain group, the officials have the

obligation to cease denying benefits not just to the named plaintiffs but also to all other qualified members of the group." (citation omitted)).

A recent Eleventh Circuit case supports this court's approach. In <u>Garrido v. Dudek</u>, 731 F.3d 1152 (11th Cir. 2013), the court reviewed a district court's entry of a permanent injunction striking down a state agency's rule that a particular form of autism treatment was experimental and therefore not covered under the Medicaid Act. <u>Garrido</u>, 731 F.3d, at 1159. The court vacated and remanded the portion of the district court's injunction requiring the state to provide a blanket authorization of the treatment for all Medicaid recipients with autism because, as the district court had itself discussed at some length, a determination whether the treatment was indeed medically necessary had to be made for each individual recipient; the court could properly make this determination only with respect to the named plaintiffs before it. <u>Id</u>. at 1159-61. In other words, the

appellate court vacated the portion of the injunction that purported to guarantee treatment to others about whom no individualized determination had been made. Here, by contrast, all Medicaid recipient-patients at PPSE are, for the purposes of this narrow legal question, indistinguishable.

The appellate court upheld the portion of the Garrido injunction analogous to the injunction being entered here--the portion that enjoined the State from enforcing the rule that mandated denial of coverage generally.  See K.G. ex rel. Garrido v. Dudek, 864 F. Supp. 2d 1314, 1328 (S.D. Fla. 2012) (Lenard, J.) ("Defendant is enjoined from enforcing Florida Behavioral Health Rule 2-1-4 as it relates to autism, Autism Spectrum Disorder, and Applied Behavioral Analysis treatment.").  Though the court held that it was inappropriate to grant relief ordering coverage of treatment in all cases, an injunction against enforcement of a rule that prevented case-by-case determinations--relief that directly benefitted far

more recipients than the three named plaintiffs--was nevertheless proper.  It is proper here as well.

* * *

In summary, Doe is very likely to succeed on her claim that the Governor's termination of PPSE's provider agreement violated the Medicaid Act.  The reasons for this are simple.  The Act requires States to provide a reason for such terminations.  Here, as is plain from the Governor's letter, the State provided none.  Finally, even the post-hoc reasons cited by the defendants in briefing before this court are plainly inapplicable to PPSE.  On these bases, Doe's success on the merits of her Medicaid claim is near-certain.

An appropriate preliminary injunction will be entered, requiring that, for the benefit of Doe, the State reinstate its Medicaid provider agreement with PPSE.

DONE, this the 28th day of October, 2015.

/s/ Myron H. Thompson_____

UNITED STATES DISTRICT JUDGE